IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 11 |
| EQUIPMENT ACQUISITION ) | |
| RESOURCES, INC., ) | |
| ) | Case No. 09-bk-39937 |
| Debtor. ) | |
| _____) | |
| ) | |
| WILLIAM A. BRANDT, JR., solely in his ) | Hon. Timothy A. Barnes |
| capacity as Plan Administrator for ) | |
| Equipment Acquisition Resources, Inc., ) | |
| ) | |
| Plaintiff, ) | Adv. No. 11-ap-02236 |
| v. ) | |
| ) | |
| PLAINSCAPITAL LEASING, LLC, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the Bankruptcy Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred of all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). A proceeding to avoid and recover fraudulent conveyances arises in a case under title 11 and is specified as a core proceeding. 28 U.S.C. § 157(b)(2)(H).

Accordingly, final judgment is within the scope of the court's authority.

PROCEDURAL HISTORY

This matter comes before the court on the motion (the "Motion To Dismiss") of Defendant, PlainsCapital Leasing, LLC ("PlainsCapital" or "Defendant") to dismiss the amended adversary complaint (the "Complaint") filed by Plaintiff, William Brandt, Jr., in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc. ("EAR", "Debtor" or "Plaintiff"). The Complaint, as described below, seeks the recovery of approximately $4.3 million in lease payments alleged to have been fraudulently transferred from EAR to PlainsCapital as part of a fraudulent lease scheme orchestrated by one Sheldon Player ("Player"). Defendant seeks dismissal under Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim upon which relief may be granted or to plead fraud with the particularity required by Rule 9(b).

BACKGROUND

Unless otherwise indicated, the following facts are taken from Plaintiff's Complaint and are assumed to be true for purposes of the motion to dismiss, all reasonable inferences being drawn in Plaintiff's favor. *See, e.g., Cole v. Milwaukee Area Technical College District*, 634 F.3d 901, 903 (7th Cir. 2011).

EAR was incorporated in 1997. It was designed to operate as a refurbisher of special machinery, a manufacturer of high-end technology parts, and a process developer for the manufacture of high-technology parts. The bulk of EAR's stated revenue derived from refurbishing and selling high-tech machinery; it was set up to purchase high-tech equipment near the end of its useful life at prices that were low relative to the cost of new units, and then refurbish the equipment for sale to end-users at substantial gross margins using a propriety process.

Eventually, EAR's apparent success came to an end, because of Player's abuse of EAR. Player systematically and repeatedly caused EAR to enter into unnecessary and harmful agreements related to over-valued machinery. As part of his scheme, Player caused EAR to enter into financing and financing-type lease agreements with certain entities (the "Financial Entities") related to equipment that was allegedly owned by Machine Tools Direct, Inc. ("MTD"). However, MTD was a mere strawman in Player's scheme. Many, if not all, of the sale invoices from MTD to the Financial Entities grossly overstated the value of the underlying equipment. MTD "purchased" the equipment from EAR mere days before MTD sold the equipment to either EAR or the Financing Entity. In those instances, Player purportedly caused EAR to transfer title to the equipment to MTD, and MTD then sold that equipment to EAR (or the Financial Entity in the case of a lease) at an inflated purchase price. As a result of this scheme, Player caused EAR to lease equipment at a cost far in excess of its actual value.

EAR did not benefit from these circular transfers, as EAR paid far more for the equipment under the financing or lease agreements than it ever received via the sale to MTD. Moreover, Player's defalcations further prevented EAR from having the funds necessary to repay the related financing or lease obligations, thus requiring EAR to enter into an increasing number of these transactions in order to have sufficient funds to repay its current obligations.

Plaintiff contends that "[i]n effect, Player's misconduct amounted to a Ponzi-scheme where funds from later Financing Entities were used to repay EAR's obligations under earlier financing and lease obligations." Complaint, at ¶ 15.

In 2009, after receiving numerous notices of default from its creditors, EAR sought the assistance of outside counsel and turn-around specialists in order to assist in the company's rehabilitation. After some investigation, EAR's outside counsel and consultants discovered what they believed to be evidence of potential fraud in EAR's leasing activity.

Upon this discovery, EAR's officers and directors resigned on October 8, 2009. With the resignation of the former officers and directors, Player too lost any power to influence or control EAR's operations. Plaintiff was then elected as sole member of the board of directors and as the Chief Restructuring Officer, vested with power to assume full control of EAR's operations and all the powers and duties of the President, Chief Executive, and Treasurer of EAR. Pursuant to these powers, Plaintiff filed, on October 23, 2009, EAR's voluntary Chapter 11 petition.

On July 15, 2010, the court confirmed EAR's Second Amended Plan of Liquidation (the "Plan"), and William Brandt, Jr. was appointed as the Plan Administrator ("Plaintiff" or the "Plan Administrator"), with the authority to pursue "Litigation Claims," as defined in the Plan. Plaintiff seeks to bring the claims alleged in the Complaint pursuant to that authority.

## PLAINTIFF'S TRANSACTIONS WITH DEFENDANT

According to Plaintiff, EAR entered into at least seven master equipment lease agreements with Systems Financial Credit during the period between April 2005 and December 2005. In each instance, Systems Financial Credit assigned its interest under the master lease agreement to PlainsCapital on or about the same day that the agreement was executed. Under the terms of each master lease, EAR was required to make monthly payments to PlainsCapital with respect to the equipment identified in the master lease.

Plaintiff alleges upon information and belief that Player caused EAR to enter into the PlainsCapital leases because doing so furthered his fraudulent scheme. The transactions with PlainsCapital are the type of financing arrangements that Player used to perpetuate his scheme. As a result of the scheme, EAR creditors that had financing agreements and leases which were part of Player's scheme have been unable to identify what, if any, equipment that was previously located at EAR's facilities was subject to a valid security agreement or lease. Plaintiff contends that because the transfers made to PlainsCapital were part of Player's fraudulent scheme, the transfers that EAR made to PlainsCapital in satisfaction of the master lease obligations were made with the actual intent to hinder, delay, and defraud EAR's remaining creditors.

Within four years preceding the filing of the chapter 11 petition, and specifically from October 25, 2005 through November 20, 2006, EAR made transfers to PlainsCapital, in accordance with the requirements of the master leases, totaling $4,252,398.66. Plaintiff seeks the avoidance of those transfers under 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5(a)(1) and the recovery of same for the benefit of the estate under 11 U.S.C. § 550.

## DISCUSSION

1. <u>Standing To Pursue Claims under Section 544 of the Bankruptcy Code</u>.

PlainsCapital asserts that the Complaint must be dismissed under Rule 12(b)(1) because the Plan Administrator lacks standing to bring causes of action under section 544, as they were not adequately preserved in the Plan.

As noted by PlainsCapital, a court may look beyond the pleadings in determining whether a plaintiff has standing, by reviewing documents such as a disclosure statement or confirmed plan. Supporting Memorandum, at 5 (citing *Apex Digital, Inc. v. Sears Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009)). The parties quote relevant portions of the Plan and the Debtor's Disclosure Statement. The Plan's reservation clause reads, in pertinent part, as follows:

> 4.5 Preservation of Litigation Claims. Unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order or other agreement entered into or delivered in connection with the Plan: (a) the Plan Administrator shall exclusively retain and may prosecute and enforce, and the Debtor expressly reserve and preserve for these purposes, in accordance with sections 1123(a)(5)(B) and 1123(b)(3) of the Bankruptcy Code, any Claims, demands, rights, causes of action and Litigation Claims that the Debtor or the Estate may hold against any person or entity ... .

"Litigation Claims" are defined as "the Claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or Estate may hold against any person or entity under the Bankruptcy Code or any non-bankruptcy law, including, but not limited to, Avoidance Actions, Claims, rights of action, suits or proceedings against 'insiders' of the Debtor as such term is defined in section 101(31) of the Bankruptcy Code." Plan, § 1.43. Finally, "Avoidance Actions" are defined as "any cause of action against persons or entities arising under sections 502, 510, 541, 542, 545, 547 through 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced before or after the Effective Date to prosecute such Avoidance Actions." PlainsCapital contends that no section 544 claims were reserved in the Plan because the definition of Avoidance Actions "glaringly omits" section 544.

As noted by Judge Goldgar in *In re Commercial Loan Corp.*, 363 B.R. 559, 567 (Bankr. N.D. Ill. 2007), "[w]hat constitutes an effective reservation of claims in a chapter 11 plan is a controversial question" upon which the "only area of agreement" is that a plan can in fact reserve claims by virtue of section 1123(b)(3)(B) of the Bankruptcy Code. That section provides in relevant part that a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" of any claim belonging to the debtor or the estate. Courts are split as to the degree of specificity required for any such reservation of claims. As characterized by Judge Goldgar, the decisions on this issue fall into roughly three camps, the first maintaining that general reservations of claims are sufficient. *Id.* The other two camps require some degree of specificity (ranging from precise identification of each claim to a description of merely the categories of claims reserved) but differ as to the legal basis for that requirement; one camp bases it on principles of *res judicata* and the other on the "notice" function served by section 1123(b)(3)(B). *Id.*

The Seventh Circuit decisions on this issue fall into the latter two camps. In *D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York*, 112 F.3d 257 (7th Cir. 1997), the court applied principles of *res judicata* in determining that an action sought to be pursued by the debtor post-confirmation was barred. The court explained that confirmed plans, like final judgments, are binding on the parties and their privies, and issues that could have been raised related to such plans but were not are barred by *res judicata*. However, *res judicata* will not apply when a cause of action has been expressly reserved for later adjudication. *Id.* at 259-60. In *D & K*, the court found the debtor's action to be barred, because the purported reservation merely preserved "all causes of action existing in favor of the Debtor and the Debtor in Possession." *Id.* at 259. The court held that the "identification must not only be express, but also the claim must be specific," and a "blanket reservation that seeks to reserve all causes of action reserves nothing." *Id.* at 261.

In *In re P.A. Bergner & Co.*, 140 F.3d 1111 (7th Cir. 1998), on the other hand, decided by the Seventh Circuit one year later, the court upheld a reservation clause that waived all avoidance actions other than those pending on the date the disclosure statement was approved. The court did not mention *res judicata*, but analyzed the issue under section 1123(b)(3)(B) and decided that the reservation clause satisfied the "notice" function of that provision. *Id.* at 1117. The court further stated that courts addressing the need for 'specific and unequivocal' language "have focused on the requirement that plans unequivocally retain claims of a given type, not on any rule that individual claims must be listed specifically." *Id.*

In *Commercial Loan Corp.*, Judge Goldgar reviewed these Seventh Circuit decisions but found it unnecessary to reconcile them, because regardless of whether the *res judicata* or notice approach was employed, the defendant had no right to challenge the adequacy of the reservation clause. As for *res judicata*, the defendant was unable to meet one of the prerequisites for application of the doctrine, *i.e.* an identity of the parties or their privies between the first and second actions.[1] The defendants, who had never filed proofs of claim or participated in the confirmation process, were neither parties to the bankruptcy case nor in privity with any party. As such, they could not challenge the reservation clause and thereby defeat the avoidance action on *res judicata* grounds. *Id.* at 569. The court held that the defendants fared no better under the notice approach.[2]

A similar result was reached by Judge Squires (ret.) in an adversary proceeding filed by the Plan Administrator in this case. In *Brandt v. Luxor Hotel & Casino (In re Equipment Acquisition Resources, Inc.)*, Adv. Proc. No. 10ap02164, 2011 WL 2460871 (Bankr. N.D. Ill. June 16, 2011) ("*Luxor*"), the Plan Administrator sued Luxor Hotel and Casino ("LHC") to avoid and recover

---

[1]    The three prerequisites for application of the *res judicata* doctrine are: "(1) a final judgment on the merits in an earlier action, (2) an identity of the cause of action in both the earlier and later suit, and (3) an identity of parties or privies in the two suits." *Tartt v. Northwest Community Hosp.*, 453 F.3d 817, 822 (7th Cir. 2006) (internal quotation omitted).

[2]    The court in *Commercial Loan* explained that the rationale under the notice approach pursuant to § 1123(b)(3)(B) is that a creditor is entitled to notice about claims that will be pursued after confirmation, either because they might augment the estate or because the creditor himself may be a target of the claims, and the "creditor can 'adjust [his] vote accordingly.'" *Id.* at 570 (quoting from *In re Goodman Bros. Steel Drum Co.*, 247 B.R. 604, 608 (Bankr. E.D.N.Y. 2000)). If the defendant is not a creditor, that rationale is inapposite. *See In re Kmart Corp.*, 310 B.R. 107, 120 (Bankr. N.D. Ill. 2004) (disclosure and notice afforded by § 1123(b)(3) retention provision is directed toward creditors, not potential defendants on reserved claims).

alleged fraudulent transfers under sections 544, 548 and 550 of the Bankruptcy Code. LHC moved for judgment on the pleadings, contending that the reservation of claims in the Plan in this case was inadequate. The Plan Administrator responded, arguing that LHC could not challenge the adequacy of the Plan's reservation of claims because it was not a creditor and was a stranger to the bankruptcy case. In considering this disputer, Judge Squires noted that LHC was not listed on Debtor's schedules, did not file a proof of claim, was not involved in the confirmation process and was not in privity with any party that was a creditor in this case. Accordingly, Judge Squires found that LHC could not assert *res judicata* to challenge the Plan's reservation of claims and denied its motion for judgment on the pleadings. *Id.*[3]

The same conclusion is required here. PlainsCapital, while not responding to the Plan Administrator's *res judicata* argument, insists in another portion of its reply brief that "[l]egally and factually," PlainsCapital and the *Luxor* defendant "are virtually identical." Reply Memorandum, at 4. PlainsCapital notes that neither it nor LHC filed a proof of claim or were listed on Debtor's schedules. PlainsCapital is not a creditor in this case, and like LHC, there is no suggestion that it is in privity with any creditor. As PlainsCapital is a stranger to this bankruptcy case, it cannot assert a *res judicata* challenge to the adequacy of the Plan's reservation clause.[4]

The court finds that even if PlainsCapital had the right to challenge the reservation clause, it would not prevail, because the section 544 claims were in fact adequately reserved in the Plan. In this regard, the court rejects PlainsCapital's contention that Judge Squires' ruling to the contrary in *Luxor* is the law of this case. Judge Squires did state in *Luxor* that the Plan failed to adequately reserve section 544 claims. However, as he found that LHC had no right to challenge the adequacy of the reservation clause, the statement that the clause failed to reserve section 544 claims was dictum. Based on LHC's inability to assert the *res judicata* challenge, LHC' motion for judgment on the pleadings was denied.[5] Judge Squires' statement concerning the failure to reserve section 544 claims, as dictum, does not constitute the law of this case. *See United States v. Bates*, 614 F.3d 490, 494 (8th Cir.2010); 18B C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4478 (2d ed. 2012) ("[t]he actual-decision requirement means that dictum is not the law of the case").

Even if Judge Squires' statement did constitute the law of this case, there is a compelling reason to reconsider it. As noted by the Seventh Circuit: "[W]hile a ... judge should carefully consider the propriety of re-examining a prior ruling of another ... judge in the same case, when good reasons for doing so appear (such as new evidence or controlling law, or clear error), the "law of the case" doctrine must yield to rational decisionmaking." *Peterson v. Lindner*, 765 F.2d 698, 704-

---

[3]    Judge Squires found—and this court agrees—that LHC's qualification as a contingent creditor under § 502(h) of the Bankruptcy Code (by virtue of its status as a known avoidance action target) did not by itself make LHC a "party" to the bankruptcy case. *Luxor*, 2011 WL 2460871.

[4]    The same result would follow if the notice approach under § 1123(b)(3)(B) were employed, for the reasons articulated by Judge Goldgar in *Commercial Loan*. *See* n. 2, *supra*; *see also Kmart Corp.*, 310 B.R. at 120.

[5]    Dictum has been characterized as language not essential to the outcome of a case. *See, e.g., In re Repository Techs., Inc.*, 601 F.3d 710, 718-719 (7th Cir. 2010) (bankruptcy court's statement about debtor's good faith was dictum, as it was not essential to outcome of dismissal; indeed, good faith finding would have supported opposite outcome); *see also Tate v. Showboat Marina Casino Partnership*, 431 F.3d 580, 582 (7th Cir. 2005) ("the holding of a case includes, besides the facts and the outcome, the reasoning essential to that outcome").

705 (7th Cir. 1985); *see also McMasters v. U.S.*, 260 F.3d 814, 818 (7th Cir. 2001) (doctrine does not apply if court is convinced that prior decision is clearly erroneous); *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 562-63 (7th Cir. 1982) (interlocutory rulings may be reconsidered at any time prior to final judgment, and where one judge believes ruling of another judge to have been erroneous, she is not foreclosed by law of the case doctrine from reconsidering it).

   Here, if needed, reconsideration is warranted. Despite Judge Squires' thoughtful analysis on the issue before him, his statement concerning failure to retain the section 544 claims—were it to have the force of law—would be clearly erroneous.

   PlainsCapital contends that because section 544 was not included in the particularized list of statutory provisions set forth in the definition of Avoidance Actions, claims under section 544 were not reserved in the Plan. PlainsCapital does not contend that the provisions reserving claims, when read together, were ineffective for lack of specificity. While PlainsCapital asserts that the "definition of 'Litigation Claims,' by itself, is too broad to reserve any causes of action," the "attempted reservation is saved by its inclusion of 'Avoidance Actions,'" which reserves "the specific chapter 5 causes of action listed and any 'related' state or federal claims." Reply Memorandum, at 2, 9 (citing *Luxor*, 2011 WL 2460871, at *7-8). According to PlainsCapital, "'nothing in the definition of "Avoidance Action" evinces an intent to preserve an action under § 544.'" *Id.*

   PlainsCapital's contention ignores well-settled principles governing the interpretation of chapter 11 plans. A plan is analogous to a contract and is subject to the ordinary rules of contract construction. *See, e.g., Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002) (citations omitted); *Commercial Loan*, 363 B.R. at 570-71; *Kmart Corp.*, 310 B.R. at 125. Accordingly, the court should examine the Plan as a whole, "giving effect to all parts and language ... according to their 'ordinary and natural meaning.'" *Kmart Corp.*, 310 B.R. at 125 (quoting from *Wonderland Shopping Center Venture L.P. v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir.2001)). As noted by Plaintiff, this is consistent with Illinois law, which governs the construction of the provisions at issue here.[6] Under Illinois law, the "primary objective in construing a contract is to give effect to the intent of the parties," and such intent "is not to be gathered from detached portions of a contract or from any clause or provision standing by itself," but from a review of the contract as a whole. *Gallagher v. Lenart*, 226 Ill.2d 208, 232-33 (2007).

   In *Luxor*, Judge Squires found that the "Avoidance Actions" definition specifically reserved state law fraudulent transfer causes of action. Indeed, PlainsCapital itself admits that the Plan "arguably preserved" such causes of action. Reply Memorandum, at 6, n. 4. By virtue of including state law fraudulent transfer claims in that definition, the parties' intent is unmistakable; they intended for the Plan Administrator to be able to assert such causes of action. Yet section 544(b), which was omitted from the itemized list of specific statutory provisions contained in the "Avoidance Actions" definition, is the very mechanism by which state law fraudulent transfer claims

---

   [6]  Section 11.11 of the Plan, titled "Governing Law," provides: "Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Illinois, without giving effect to any principles of conflicts of law of such jurisdiction."

Case 11-02236    Doc 37    Filed 09/28/12    Entered 09/28/12 18:38:46    Desc Main
                Document      Page 8 of 11

are brought, because it confers upon the trustee (or here, the Plan Administrator)[7] the creditor status required under state law to bring such claims.[8] See 740 ILCS 160/5.

PlainsCapital seeks to rely on the statement in *Luxor*, that "nothing in the definition of "Avoidance Actions" evinces an intent to preserve an action under § 544." Reply Memorandum, at 9-10 (quoting from *Luxor*, 2011 WL 2460871, at *8)., PlainsCapital argues that because section 544 does not on its face deal with fraudulent transfer claims, it is not a "related state or federal statute[]" within the meaning of the "Avoidance Actions" definition.

As noted previously, PlainsCapital's contention ignores the reality that section 544 is the only mechanism by which the state fraudulent transfer claims can be brought and without which the reservation of such claims would be rendered meaningless.[9] Indeed, reading the provisions in context and giving effect to the parties' clear intent, the court finds that section 544 was in fact included by virtue of the reference to "related" federal statutes. Fraudulent transfer claims under the Illinois statute, specifically 740 ILCS 160/5, are the state law counterparts to claims under section 548 of the Bankruptcy Code, and since section 544 is the only means by which such counterpart state law claims can be brought, section 544 is indeed a federal statute "related" to section 548 within the purview of the "Avoidance Actions" definition.

Accordingly, the court holds that claims under section 544 of the Bankruptcy Code were effectively preserved in the Plan.[10]

2. Failure To State a Plausible Claim or To Plead Fraud with Particularity

Defendant also seeks to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to plead a plausible claim or to plead fraud with the particularity required by Rule 9(b).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As noted by the Seventh Circuit in *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773 (7th Cir. 2007), the Supreme Court "has interpreted that language to impose two easy-to-clear hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what

---

[7] *See* 11 U.S.C. § 1123(b)(3)(B).

[8] Section 544(b) provides in relevant part that the "trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 ... or that is not allowable only under section 502(e) ...."

[9] Under Illinois law, a contract must not be construed so as to render provisions meaningless or surplusage. *See, e.g., Kimball Hill Management Co. v. Roper*, 314 Ill.App.3d 975, 981 (2000).

[10] In so holding, the court also rejects PlainsCapital's contention that because it was omitted from the list of potential defendants attached as Exhibit C to the Disclosure Statement, there was no effective reservation of a cause of action against it. As correctly noted by Judge Squires in *Luxor*, although the Disclosure Statement "provided that '[a] list of all potential Litigation Claims against whom litigation recoveries may be sought is attached hereto as Exhibit C,'" the Disclosure Statement "further provided that '[i]n the event of any conflict between this Disclosure Statement and the Plan ... the terms of the Plan ... are controlling.'" *Luxor*, 2011 WL 2460871 at *2. The court finds that such a conflict exists, and accordingly the terms of the Plan, as construed by the court herein, prevail.

the ... claim is and the grounds upon which it rests.' ... Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.* at 776 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 569 n.14 (2007)). While the complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 550 U.S. at 555-56. The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Bell Atlantic*).

Where fraud is alleged, a more rigorous pleading standard comes into play. Rule 9(b) provides, *inter alia*, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Under this standard, a plaintiff must state the "who, what, when, and where" of the alleged fraud. *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992).

Again, the Complaint in this case alleges actual intent fraudulent transfers, which require proof that the transfers were made by Debtor "with actual intent to hinder, delay, or defraud" creditors. *See* 11 U.S.C. §548(a)(1)(A); 740 ILCS 160/5(a)(1). The only element at issue here is the actual intent of EAR at the time the transfers were made.

Actual intent to defraud may be proved by circumstantial evidence, often referred to as badges of fraud. The commonly recognized badges of fraud include: "(1) whether the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; (2) whether the debtor retained control of the asset; (3) whether the transfer was to a family member; (4) whether the transfer was prior to debtor incurring a substantial debt; (5) whether the transfer was substantially all of debtor's assets; (6) whether the debtor received consideration for the transfer; (7) whether the transfer was disclosed or concealed; (8) whether the debtor made the transfer before or after being threatened with suit by creditors; and (9) whether the debtor absconded." *Grede v. Bank of New York Mellon*, 441 B.R. 864, 881 (N.D. Ill. 2010) (citations omitted). A single badge of fraud is insufficient to establish intent, but the presence of several may create a presumption that the debtor acted with the requisite intent to defraud. *Id.*

Here, the Plan Administrator does not allege badges of fraud. Instead, he alleges that Sheldon Player's misconduct amounted to a *Ponzi* or "*Ponzi*-like" scheme where funds from later leasing or financing entities were used to repay EAR's obligations to earlier equipment lessors and financiers.[11] In essence, the Plan Administrator relies on the "*Ponzi* scheme presumption" to establish that the transfers to the Defendant were made with actual intent to defraud EAR's other creditors.

Proof of a *Ponzi* scheme has been held sufficient to establish actual intent to hinder, delay, or defraud creditors so as to permit avoidance of a transfer as fraudulent. *Id.* (citing *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen)*, 199 B.R. 709, 717 (9th Cir. BAP 1996)). The classic *Ponzi* scheme involves an enterprise which makes payments to investors from money received from more recent

---

[11] The original *Ponzi* scheme was the subject of a Supreme Court decision arising out of the bankruptcy of Charles Ponzi. *See Cunningham v. Brown*, 265 U.S. 1 (1924).

9

investors, rather than from profits of a legitimate business enterprise. *Lake States Commodities*, 253 B.R. at 869 n.2. Proof of a *Ponzi* scheme ordinarily involves evidence that: deposits were made by investors; the *Ponzi* scheme operator conducted little or no legitimate business operations as represented to investors; the purported business operation produces little or no profits or earnings, the source of the funds being new investments by subsequent investors; and the source of payments to investors is cash infused by new investors. *See In re Lake States Commodities, Inc.*, 272 B.R. 233, 242 (Bankr. N.D. Ill. 2002). The facts in this case do not fit the classic *Ponzi* scheme model; the Defendant is not an investor and the Complaint itself alleges that EAR was in the legitimate business of "refurbishing and selling high-tech machinery." Nonetheless, the Plan Administrator contends that EAR's leasing and financing transactions were a "*Ponzi*-like" scheme and, as such, establish EAR's actual fraudulent intent.

Courts have, in fact, recognized that "even if Debtor's business operations do not exactly match the description of a Ponzi Scheme," a trustee may "still continue to characterize the business model as a Ponzi Scheme," thereby meeting the intent prong of a fraudulent transfer claim. *In re Norvergence, Inc.*, 405 B.R. 709, 730 (Bankr. D.N.J. 2009). Here, however, the Plan Administrator has failed to allege sufficient facts to establish even a "*Ponzi*-like" or similar fraudulent scheme with the required particularity. The Complaint makes general and conclusory statements as to the alleged fraudulent scheme, but fails to give any details as to the scheme itself.

There are very few details concerning the "circular transfers" that are alleged to have prevented EAR from having the funds necessary to repay current obligations, thereby requiring EAR to enter into new transactions to repay its current obligations. There are no specific facts or details to support the allegation that payments to earlier lenders were made from later lenders and not from EAR's other revenues or profits. There is not even an indication when the fraudulent leasing activity began, and only the barest outlines of a scheme are sketched.

Moreover, the key allegation of fraud with respect to the transfers at issue here is made on information and belief:

> "Upon information and belief, Player caused EAR to agree to enter into the Leases because doing so furthered his fraudulent scheme. The transactions with PCL are of the type of financing arrangements that Player used to perpetuate his wrongful scheme. As a result of the misconduct, EAR creditors that had financing and leases which were part of Player's scheme have been unable to identify what, if any, equipment that was previously located at EAR's facilities was subject to a valid security agreement or lease."

Complaint, at ¶ 20.

While fraud cannot generally be pleaded based on information and belief, such allegations are permitted when the specific facts are not available to the plaintiff and the plaintiff provides the grounds for his suspicions. *See, e.g., Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). Here, Plaintiff alleges that: EAR entered into unnecessary and harmful financing and lease agreements related to over-valued machinery, that it used a straw man to purchase or lease its own equipment and pocket a portion of the proceeds, and that because the resulting obligations exceeded the money EAR received from the transactions, EAR necessarily

entered into an increasing number of these transactions in order to have sufficient funds to repay its current obligations. The allegation then relied on by Plaintiff to connect the subject transfers to this broadly sketched scheme is that the transactions with Defendant "are of the type of financing arrangements" that were used to perpetuate the scheme. Complaint, at ¶ 20.

These allegations are not only insufficient to come within the exception for pleading on "information and belief," they are insufficient in any event to connect the transfers at issue to the alleged scheme.[12] In order "[t]o prevail, the Trustee must plead the requisite intent with respect to each transfer sought to be avoided and must connect the allegations against the Defendants to the Debtors' scheme to defraud creditors." *In re Lancelot Investors Fund, LP*, 451 B.R. 833, 839 (Bankr. N.D. Ill. 2011). Plaintiff does list the dates and amounts of the transfers at issue. However, other than the bald allegation that the transactions with Defendant were "of the type" of financing arrangements that Player used to perpetuate the alleged scheme, Plaintiff fails to describe how the payments were used to further that scheme and harm EAR's other creditors, the so-called "later lenders."

Again, to survive a motion to dismiss, a complaint must be facially plausible. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678. Here, the court cannot draw the reasonable inference that the payments to the Defendant were instrumental in an actual fraud by EAR.

## CONCLUSION

For all of the foregoing reasons, the Complaint will be dismissed in one month, on November 1, 2012, unless the Plan Administrator has amended the Complaint to provide the necessary specificity regarding the alleged fraudulent scheme and the transfers allegedly made in furtherance thereof.

A separate order will be issued, concurrent with this Memorandum Decision, (1) granting in part and denying in part Defendant's Motion To Dismiss, (2) providing Plaintiff leave to amend the Complaint no later than October 31, 2012, and (3) providing that the Complaint will be dismissed on November 1, 2012 by separate order of the court if no amendment is properly and timely filed.

Dated:  September 28, 2012                    ENTER:

                                              _____
                                              Timothy A. Barnes
                                              United States Bankruptcy Judge

---

[12] The court notes that while under Rule 9(b), states of mind may be alleged generally, the Supreme Court noted in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that "generally" as used in Rule 9(b) "is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Id.* at 686-87.